UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

REA NAVIGATION, INC.,

Plaintiff,

- against -

WORLD WIDE SHIPPING LTD.,
KAALBYE PROJECTS, KAALBYE
SHIPPING INTERNATIONAL LIMITED,
and SILVER STREAMS LTD.,

Defendants.

-------------------------------------------------------X

**OPINION AND ORDER**

**08 Civ. 9951 (SAS)**



SHIRA A. SCHEINDLIN, U.S.D.J.:

I.    INTRODUCTION

On January 15, 2009, this Court entered an ex parte order on behalf of

REA Navigation, Inc. ("REA"), directing attachment and garnishment of the assets

of World Wide Shipping Ltd. ("WWS"), or Kaalbye Projects, Kaalbye Shipping

International Limited, Silver Streams Ltd. as alter egos of WWS.[1]   In total, this

---

[1]       This Court had previously entered ex parte orders on November 20,
2008 and December 16, 2008 naming fewer alter egos. *See* Ex Parte Order for
Process of Maritime Attachment and Garnishment, *REA Navigation, Inc. v. World
Wide Shipping Ltd.*, No. 08 Civ. 9951, Docket No. 3 (S.D.N.Y. Nov. 20, 2008)
(naming only WWS); Revised Ex Parte Order for Process of Maritime Attachment

1

Court authorized the attachment of up to $1,085,920.61 of defendants' funds,

representing damages for an alleged breach of contract, non-payment of hire, and

associated interest and fees. Substantial funds having been seized, World Wide

Shipping now moves to vacate the portion of the attachment order derived from an

indemnity claim. For the reasons stated below, the request to vacate the order of

attachment in part is granted.

## II.    FACTS

### A.    The Maritime Agreements

On August 12, 2008, WWS chartered the M/V Lady Rea – a

Panamanian-flag transport ship – from REA for a period of 90 to 150 days.[2]

Clause 30(a) of the charter permits WWS to present the ship's master with bills of

lading or to sign bills of lading on the master's behalf.[3] However, that authority is

expressly limited by Clause 30(b), which states,

> All bills of lading shall be without prejudice to this Charter
> Party and [WWS] shall indemnify [REA] against all

---

and Garnishment, *REA Navigation, Inc. v. World Wide Shipping Ltd.*, No. 08 Civ.
9951, Docket No. 4 (S.D.N.Y. Dec. 16, 2008) (naming WWS and Kaalbye
Projects).

[2]    *See* 8/23/08 Time Charter cl. 1, Ex. H to 1/30/09 Declaration of John
Werner, attorney for defendant World Wide Shipping ("Werner Decl.").

[3]    *See id.* cl. 30(a). *See also id.* cl. 66 (same).

> consequences or liabilities which may arise from any
> inconsistency between this Charter Party and any bills of
> lading signed by [WWS] or by the Master at their
> request."[4]

The charter contains a performance guarantee, specifically stating that "[t]he Master shall perform the voyages with due despatch."[5]   Disputes arising under the charter are governed by English law.[6]

On September 18, 2008, the master of the Lady Rea signed two bills of lading at the request of WWS.[7]   The bills of lading state that WWS would carry freight on behalf of Metal Construction of Greece S.A. ("Metka") from Volos, Greece to Karachi, Pakistan.[8]   The bills of lading do not contain requirements that the freight be delivered on a particular date.[9]   However, upon arrival in Karachi, the bills of lading specify that Karachi Electric Supply Corporation Ltd. ("Karachi

---

[4]     *Id.* cl. 30(b).  *Accord* cl. 66 (same).

[5]     *Id.* cl. 8(a).

[6]     *See id.* cl. 45(b).

[7]     *See* 9/18/08 Bills of Lading, Rule E Hearing Ex. 1.

[8]     *See id.*  Although the bills of lading reference the contract between the exporter and importer of the cargo – along with letters of credit and similar information relating to payment – the bills of lading do not purport to import the terms of those contracts.  *See id.*

[9]     *See id.*

3

Electric") be notified.[10]

### B.   The Karachi Electric Contract and Lawsuit

On January 27, 2007, Metka entered into a contract with Karachi

Electric to supply equipment for power generation at Korangi, Pakistan.[11]   The

contract specified that if the facility was not ready by a specified date, Metka

would incur a .5% deduction in the contract price for each week of delay, up to a

10% penalty.[12]

On September 15, 2008, Metka began loading materials needed in

Pakistan for completion of the Karachi Electric project onto the Lady Rea, and the

Lady Rea departed Greece on September 18.   Between Greece and Pakistan, the

Lady Rea called at Jeddah, Saudi Arabia, on September 27, 2008, in order to

discharge a small quantity of goods.   At Jeddah, port authorities detained the ship,

as its class certification had expired.   A required inspection resulted in the

unloading and reloading of nearly all freight on board – which allegedly damaged

Metka's cargo – and delayed the ship a total of twenty-eight days.   The Lady Rea

---

[10]      *See id.*

[11]      *See* Complaint, *Metal Construction of Greece S.A. v. Owners of the Vessel M.V. Lady Rea* ("Karachi Complaint"), ¶ 1, Admiralty Suit No. 35 (Sindh H.C. 2008) (Pak.), Ex. I to Werner Decl.

[12]      *See* undated Contract art. 12.1, Ex. A to Karachi Complaint.

Electric") be notified.[10]

**B.   The Karachi Electric Contract and Lawsuit**

On January 27, 2007, Metka entered into a contract with Karachi Electric to supply equipment for power generation at Korangi, Pakistan.[11]  The contract specified that if the facility was not ready by a specified date, Metka would incur a .5% deduction in the contract price for each week of delay, up to a 10% penalty.[12]

On September 15, 2008, Metka began loading materials needed in Pakistan for completion of the Karachi Electric project onto the Lady Rea, and the Lady Rea departed Greece on September 18.  Between Greece and Pakistan, the Lady Rea called at Jeddah, Saudi Arabia, on September 27, 2008, in order to discharge a small quantity of goods.  At Jeddah, port authorities detained the ship, as its class certification had expired.  A required inspection resulted in the unloading and reloading of nearly all freight on board – which allegedly damaged Metka's cargo – and delayed the ship a total of twenty-eight days.  The Lady Rea

---

[10]     *See id.*

[11]     *See* Complaint, *Metal Construction of Greece S.A. v. Owners of the Vessel M.V. Lady Rea* ("Karachi Complaint"), ¶ 1, Admiralty Suit No. 35 (Sindh H.C. 2008) (Pak.), Ex. I to Werner Decl.

[12]     *See* undated Contract art. 12.1, Ex. A to Karachi Complaint.

4

rachi only three days after its departure from Jeddah.[13]

On October 29, 2008, Metka filed suit against REA as owner of the Lady Rea.[14]  Metka alleged that REA, by its failure to maintain proper class certification, had caused damage to Metka's cargo and increased the likelihood that Metka would not complete the construction project in time, resulting in liquidated damages.[15]  The Pakistani High Court authorized arrest of the Lady Rea as security, and REA's insurers issued a €550,000 bond to secure the vessel's release.[16]  REA is seeking to recover these funds from WWS and has obtained an attachment order from this Court for these particular funds.  REA has commenced arbitration against WWS in London for indemnification.[17]

## III.  LEGAL STANDARD

### A.  Vacatur Under Rule E(4)(f)

---

[13]     *See* Karachi Complaint ¶¶ 4-5.  Although details of the voyage have not been verified, the account in the Karachi Complaint is assumed to be true for the purpose of ascertaining the nature of the dispute.  REA neither confirmed nor denied the relevant allegations.  *See* Rule E Hearing Transcript, March 4, 2009, at 5:10-7:12.

[14]     *See* Karachi Complaint.

[15]     *See id.* ¶¶ 8-9.

[16]     *See* Second Amended Complaint ¶ 31.

[17]     *See id.* ¶ 38; Memorandum of Law in Opposition to Motion at 1.

Supplemental Rules B and E of the Federal Rules of Civil Procedure govern attachment of assets in maritime actions. If the defendant is not present within a district, Rule B allows for the attachment of the defendant's assets up to the amount in dispute.[18] Rule E entitles a party claiming an interest in attached property to "a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated."[19] The Second Circuit has held that in addition to meeting the service and filing requirements of Rules B and E, a plaintiff opposing vacatur of an attachment must show that "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment."[20] "Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rules B and E."[21]

## B.  Ripeness Under English Law

Under English law, there are three ways in which an indemnity claim

---

[18]    *See* Fed. R. Civ. P. Supp. R. B(1)(a).

[19]    Fed. R. Civ. P. Supp. R. E(4)(f).

[20]    *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty, Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006).

[21]    *Id.* at 445 n.5.

6

may accrue. Two are relevant to this case.

> The first way is by an action for damages for breach of contract (or warranty). In such a case (A) will be in a position to claim that the incurring of his liability to (B) flowed directly from an act of (C) which constituted a breach of a contract between (A) and (C) or of a warranty given by (C) to (A). . . . The cause of action will date from the date of breach.
>
> . . .
>
> The third way in which (A) may claim against (C) in respect of sums which he has had to pay to (B) is under an implied indemnity. As I understand the matter, such an implied indemnity would prima facie be a general indemnity of the kind recognized by the common law . . . . [and (A)] could not sue [(C)] unless he could aver payment to [(B)].[22]

When a charterer obliges a ship's master to sign a bill of lading that imposes

obligations on the owner of the ship that are more onerous than those contained in

the charter party, an indemnification claim for liability resulting from increased

exposure constitutes a contract claim that vests at the time of breach.[23]

## C.    Discretion to Secure Contingent Claims

In 1965, the Second Circuit held that a district court has discretionary

---

[22]    *Bottiglieri di Navigazione SpA v. Tradeline LLC*, 472 F. Supp. 2d 588, 590 (S.D.N.Y. 2007), *aff'd*, 293 Fed. Appx. 36 (2d Cir. 2008) (quoting *Telfair Shipping Corp. v. Intersea Carriers S.A.* ("*The Caroline P*"), [1984] 2 Lloyd's Rep. 466, 474-75 (Eng.).

[23]    *See Cathiship S.A. v. Allanasons Ltd.* ("*The Catherine Helen*"), [1998] 2 Lloyd's Rep. 511, 517 (Eng.).

authority to allow Rule B attachments to secure contingent liabilities.[24]  However,

in 2006, the Second Circuit stated in *Aqua Stoli Shipping, Ltd. v. Gardner Smith*

*Pty, Ltd.* that in the absence of a valid prima facie *admiralty claim*, a district court

"*must* vacate an attachment."[25]  As a result, several district court decisions have

questioned whether the equitable authority to maintain an attachment for a claim

of contingent liability has survived the decision in *Aqua Stoli*.[26]

## IV.   DISCUSSION

The bills of lading signed by the master of the Lady Rea did not

contain terms more onerous than those contained in the charter party.  Specifically,

the bills of lading do not contain specific dates by which WWS was required to

deliver the freight; nor does the Karachi complaint allege a violation of an express

delivery guarantee.  Rather, the Karachi complaint asserts that an unreasonable

delay occurred at Jeddah as a result of the owner's failure to maintain proper

certification.  The four-week delay of the Lady Rea when it lay within three days'

---

[24]     *See Greenwich Marine, Inc. v. S.S. Alexandra*, 339 F.2d 901, 905 (2d
Cir. 1965).  *But see Patricia Haynes Assocs., Inc. v. Cammell Laird Holdings
U.K.*, 339 F.3d 76, 82-83 (2d Cir. 2003) (finding that a district court did not abuse
its discretion by declining to allow an attachment for contingent liabilities).

[25]     460 F.3d at 445 (emphasis added).

[26]     *See, e.g.*, *Sonito Shipping Co., Ltd. v. Sun United Maritime Ltd.*, 478
F. Supp. 2d 532, 543 (S.D.N.Y. 2007).

8

voyage of Karachi constitutes a failure to deliver the cargo with "due despatch," a burden placed on the vessel's owner under the express terms of the charter party.[27]

As WWS did not cause the master of the Lady Rea to sign a bill of lading that increased REA's exposure beyond what was already established in the charter party, REA does not present a contract claim. Any claim stemming from Metka's suit against REA therefore falls into the third category of indemnity claims under English law and is not ripe until the primary suit has been resolved. Issuance of a bond to secure the release of the vessel does not constitute a final resolution of Metka's claims.[28]  Therefore, REA's indemnity claim against WWS is unripe, and it does not have a valid, prima facie admiralty claim necessary for an attachment pursuant to Rule B.

Moreover, any equitable authority once vested in the district courts to maintain a Rule B attachment for a contingent maritime claim has been drastically narrowed by the Second Circuit's decision in *Aqua Stoli*. This is not the exceptional case in which equity requires this Court to ignore the prematurity objection. Although REA has commenced arbitration and issued a bond to secure

---

[27]     Time Charter cl. 8(a).

[28]     *See, e.g.*, *Aosta Shipping Co. v. OSL S.S. Corp.*, No. 08 Civ. 7649, 2009 WL 161221, at *2 (S.D.N.Y. Jan. 26, 2009).

9

the release of the Lady Rea, those circumstances are not an "isolated situation[]
under peculiar factual circumstances."[29]  Moreover, there is substantial uncertainty
concerning the scope of Metka's liability to Karachi Electric, let alone REA's
eventual liability to Metka.  Given the conjecture involved in establishing the
scope of REA's prima facie claim against WWS, equity weighs in favor of
vacating the attachment until the claim has become ripe.

The attachment order is therefore modified to eliminate the sum
reflecting the Karachi dispute as well as attendant interest.  Specifically, the
principal claim is reduced by $700,699.44 and the interest claim is reduced by
$109,046.35.  Moreover, the authorized sum of attorney's fees and costs that may
be attached is reduced by one-third, or $50,000, to reflect the diminished size of
the principal claim.  In sum, plaintiff may attach no more than $226,174.82.

## V.    CONCLUSION

For the foregoing reasons, defendant's motion to vacate the
attachment in part is granted.  Plaintiff REA Navigation may attach no more than
$226,174.82 belonging to defendants.  The Clerk of the Court is ordered to close
this motion.

---

[29]    *Greenwich Marine*, 339 F.2d at 905.

10

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             March 9, 2009

11

## - Appearances -

## For Plaintiff:

Garth S. Wolfson, Esq.
Mahoney & Keane, LLP
11 Hanover Square, 10th Floor
New York, NY 10005
(212) 385-1422

## For Defendant World Wide Shipping Ltd.:

Jon Werner, Esq.
Kirk M. Lyons, Esq.
Lyons & Flood, LLP
65 W. 36th Street, 7th Floor
New York, NY 10018
(212) 594-2400

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------X

STUART BITTERMAN,

    Plaintiff,

 - against -

BERKSHIRE LIFE INSURANCE
COMPANY OF AMERICA,

    Defendant.

------------------------------------------------------X

**ORDER**

**07 Civ. 11061 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/9/09

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

    Berkshire Life has informed this Court of its intention to withdraw its motion for settlement filed on July 9, 2008.  The Clerk of the Court is therefore directed to close this motion (document no. 17).

          SO ORDERED:

         Shira A. Scheindlin
         U.S.D.J.

Dated:  New York, New York
     March 9, 2009

1